hWALTZEB, Judge.

STATEMENT OF THE CASE

Defendant, James E. McKinney, a/k/a John King, was charged by Bill of Information with armed robbery and attempted first degree murder, violations respectively of La. R.S. 14:64 and La.R.S. 14:27(30.1). The State amended the first charge from attempted first degree murder to attempted second degree murder. McKinney pleaded not guilty. A lunacy commission was appointed and determined that McKinney was sane under the McNaghten rule at the time of the alleged offense, was able to understand the charges and proceedings against him, could effectively participate in his defense and could assist his attorney, and was able to appreciate the usual, natural and probable consequences of his acts, and was able to distinguish right from wrong and was sane at the time of the offense. The trial court found probable cause and denied McKinney’s Motion to Suppress his statement. Following trial on 14 February 1991, a twelve-member jury found McKinney guilty of attempted manslaughter and armed robbery. He was sentenced on May 10, 1991, to serve ten and one-half years on the attempted manslaughter conviction and to serve ninety-nine years without benefit of parole, probation, or suspension of sentence on the armed robbery conviction; the sentences are to run concurrently. From that sentence, McKinney appeals. We affirm.

STATEMENT OF FACTS

^Chester Audler, a taxi driver, picked up a passenger on 26 July 1989, and was driving to 1700 Valence Street when his passenger, McKinney, pointed a .357 Magnum at him and said, “You know what this is.” Mr. Audler tried to use a stun gun that he kept on the front seat, but McKinney took it away from him. As McKinney was wrenching the stun gun from Mr. Audler’s hand, the stun gun went off and burned McKinney’s hand. McKinney shot Mr. Audler three times and then demanded his money. Mr. Audler gave him $28, and tried to get out of the car; however, he could not move because he was paralyzed as a result of one of McKinney’s shots. McKinney then left the area. At trial Mr. Audler identified McKinney as the man who shot him three times and robbed him.
Police Officer M.D. Audibert of Special Operations Division, testified that he responded to a call on 26 July 1989, at approximately 4:30 a.m., and observed the victim, whose face was covered with blood, half in a cab and half in the street. Officer Audibert called an ambulance and secured the scene and notified the Police Department’s Homicide and Robbery divisions. Officer Audibert reported that the victim reported his 38 or 357 hand gun was missing.
Sergeant Edward Ranee of the Robbery Division testified that he was the supervising officer at the crime scene. He testified that during the course of his investigation, the victim was hospitalized and was going to remain hospitalized for quite an extensive period of time.
Detective Rudy Fascio of the Robbery Division testified that he was unable to conduct a formal police photographic lineup for the victim because the victim was heavily medicated, and was described as being paralyzed and on the brink of death, and not in the physical condition to go through something as emotional as a photographic lineup.
| sDr. Abbott, an orthopedic surgeon, treated Mr. Audler at Baptist Hospital where the victim was taken immediately after the shooting. Dr. Abbot removed a bullet from the soft tissue of the victim’s back right side and stabilized a fracture of his shoulder with a metal rod. The most severe injury Mr. Audler received, the doctor said, was a bullet that entered his left flank, injured his spleen, and cut through (transected) his spinal cord. That bullet left him with paralysis of the lower extremities and damage to the victim’s bladder. The damage to the victim’s spleen was immediately life threatening, and caused the loss of gross amounts of blood. Another bullet caused severe damage to his shoulder, from which the victim was still suffering pain, and a third bullet went through his wrist. According to Dr. Abbott, the injury to the spinal cord and the injury to the spleen could have caused the victim to die.
Officer Fascio testified that a confidential informant notified the police that a suspect *1207 with a burn mark similar to that which the perpetrator would have received from the victim’s stun gun was staying at the LeDale Hotel in the 700 block of St. Charles Avenue and was in possession of the victim’s gun. Officer Fascio obtained a search warrant and entered the room while McKinney was sleeping. He found a stainless steel revolver on the dresser and a pair of blood-stained socks hanging over the bathtub. Officer Fascio noticed that McKinney had a bum mark on his right hand.
When McKinney was arrested, he made a statement that was read at trial, in which he described what happened when he asked the taxi driver for his money:
... I told him to stop. He stooped and I pulled out the gun and told him, “give me the money”. He looked at me and said, “oh no”. I then said, “give me the money”. He then turned and was reaching for something on the seat and I asked him, “what you’re getting man?,[”] and he said “nothing”. I then looked across the front seat and I was holding the gun in my right hand. He then shocked me 14[with] something and my gun went off at the time, falling on the floor in the back seat. I looked and saw him with that shocker in his right hand and a gun in his left hand. I hurried up and picked my gun up and started shooting. First, I shot in the roof, but he did not pay any attention to that. He was getting ready to shoot me. I then started shooting at him. I shot him in the leg first, his arm or side the second shot. I knew I had shot him a third time, but I’m not sure where. He then laid down across the front seat of the car and said “man, you done killed me”. He then took the money from his top shirt pocket and threw the money outside the cab on the ground and I picked up the money and ran. When I was running, I heard him calling for help, so I knew that I had not killed him and that he was going to be alright.
The police officer than asked, “James, where did you go after taking the cab driver’s money?” McKinney answered,
... I ran to St. Charles Avenue and a trolley ear was coming so, I got on it and rode to a gas station and gave a man a dollar to call me a cab. The cab came and I rode to Lee Circle and then I went home.
A fingerprint expert compared the prints that were lifted from the outside of Mr. Audler’s cab with McKinney’s fingerprints and found they were a positive match.

ASSIGNMENT OF ERROR: The trial court erred in imposing an excessive sentence.

The defense argues that the trial court erred in imposing an excessive sentence for the armed robbery conviction. McKinney received the maximum term of ninety-nine years without benefit of parole, probation, or suspension of sentence. Pointing out that McKinney’s only prior conviction was for solicitation for a crime against nature, the defense argues that under the sentencing guidelines — which he acknowledges were not in effect at the time of this crime — an eight to ten and one-half year term for armed robbery would have been imposed.
| gArticle 1, Section 20 of the Louisiana Constitution of 1974 provides that “No law shall subject any person ... to cruel, excessive or unusual punishment.” A sentence within the statutory limit is constitutionally excessive if it is “grossly out of proportion to the severity of the crime” or is “nothing more than the purposeless imposition of pain and suffering.” State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111,105 S.Ct. 2345, 85 L.Ed.2d 862 (1985); State v. Caston, 477 So.2d 868 (La. App. 4 Cir.1985). This court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his ease, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense charged. State v. Brogdon, 457 So.2d 616 (La.1984).
A review of the sentencing transcript reveals that the trial court provided substantial reasons for the sentences imposed, specifically that he had taken the factors enunciated in La.C.Cr.P. art. 894.1 into consideration. The trial court found that
... [I]n this case the harm that he [McKinney] has caused is something that *1208 has to last the entire lifetime of the individual that was injured. The trauma at that time of that event, the subsequent treatment, both the physical and mental condition he has placed this victim in for the rest of his life, confining him to a wheelchair at best or maybe a bed because of the injuries received in this event is certainly something I can consider ... [T]he defendant is in need of correctional treatment or custodial environment and can best be served by an institution. This man should not be out on the street. He’s dangerous. Also, it’s an undue risk that during a period of suspended sentence or probation that he could commit another crime. It is my feeling — my distinct feeling in the type of crime that took place in this case, and I’m thinking about the premeditation of having the cab driver drive to a certain location and then commit this event, it seems to me that what was possibly involved there is placing him in a position where no one could interfere with him committing this crime. It shows a real premeditated scheme in planning his event.... I don’t see how you can justify this man’s conduct, robbing an individual and shooting him and paralyzing him for life- This man [Mr. Audler] had no idea that he was going to be arm robbed I f,and paralyzed for the rest of his life when he was making a fare — driving someone to a location.... If he [McKinney] had the ability to compensate him, no compensation can ever bring you back to walking again.
The court reviewed the pre-sentencing report and found that McKinney has a longstanding drug addiction, beginning at an early age with LSD and marijuana, glue, POP, cocaine and other drugs. McKinney was admitted at sixteen pursuant to Court order to a drug treatment facility where he spent seven months, and was referred to a boys’ ranch for rehabilitation. The trial judge said:
They kept trying to say, “James, we are going to help you. We’ll send you to the boys’ ranch, place you in an institution for your drug addiction, help you all along the way.[”] But either you decided for some reason that you wanted to live a different lifestyle and you wanted to live a lifestyle that is not in conformity of a civilized society.... I think that there is a great possibility that similar circumstances could occur again.... His whole personality as addressed in that pre-sentence report showing a history of people trying to help him and he failing over and over again shows to me that it is likely to occur again.... I don’t think the defendant has dependents, and I think the defendant probably can operate in an institutional environment better than on the outside, because I think he needs custodial treatment and has to be in an environment where he will not cause any other injuries. ... [T]his defendant has participated in drug testing or drug rehabilitation programs, and it seems like it has been of no avail- [T]he more appropriate sentence to you is to make sure you never walk out of a prison again. And so a more appropriate sentence would be to give you the maximum on each sentence that will run consecutive to each — not just symbolically, but to make sure no board ever considers letting you out of jail.... [T]here are Courts above me that have thought differently, and so ... you will not receive consecutive sentences today. But it’s not because I wouldn’t want to give them to you, because I think out of all the defendants I’ve had, you are one of those ones that is in the “A” classification that you should get that sentence.
The court concluded that McKinney was one of the worst criminals, and the court imposed the maximum sentence for each conviction. Counsel for McKinney suggests that the sentencing guidelines, although not in effect at the time of this ease, were violated; however, we find that the trial court delineated the reasons |7for the sentence in the particular circumstances of this case, and that those reasons are supported by the record.
A review of similar cases reveals that the sentence imposed by the trial court is not unconstitutionally excessive. See, for example, State v. Robinson, 573 So.2d 1210 (La. App. 4 Cir.1991), writ denied, 580 So.2d 666 (La.1991).
*1209 McKinney relies on State v. Soraparu, 93-1636 (La.App. 4 Cir. 1/19/95), 649 So.2d 1100, an opinion of a divided panel of this Court which was legislatively overruled by Act 942 of 1995 which repealed La.C.Cr.P. art. 881.6.
This assignment of error is without merit.

CONCLUSION

For the foregoing reasons, James McKinney’s convictions and sentences are affirmed.

CONVICTIONS AND SENTENCES AFFIRMED.

LANDRIEU, J., concurs.