769 So.2d 44 (2000)
STATE of Louisiana
v.
Mark A. MIMS, Jeffrey Mims, and Keith Stewart.
No. 97-KA-1500.
Court of Appeal of Louisiana, Fourth Circuit.
June 21, 2000.
*49 Jasper N. Pharr, New Orleans, Louisiana, Counsel for Defendant-Appellant Mark A. Mims.
Martin E. Regan, Jr., Regan & Associates, P.L.C., New Orleans, Louisiana, Counsel for Defendant-Appellant Jeffrey Mims.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, Louisiana, Counsel for Defendant-Appellant Keith Stewart.
*50 Harry F. Connick, District Attorney of Orleans Parish, Theresa Tamburo, Assistant District Attorney, New Orleans, Louisiana, Counsel for State-Appellee.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES.
PLOTKIN, Judge.
In this criminal appeal, codefendants Mark Mims and Jeffrey Mims, brothers, were charged with the first degree murder of Eddie Charles in New Orleans on March 7, 1993. They appeal the jury's responsive verdict of manslaughter and their sentences of forty years at hard labor. Codefendant Keith Stewart pled guilty to manslaughter and was sentenced to ten years at hard labor, and he now makes an errors patent appeal. Leroy Stewart, Keith Stewart's brother, was also a codefendant; and he also pled guilty to manslaughter and received a sentence of ten years at hard labor. However, Leroy Stewart is not a party to this appeal. We affirm all three convictions and the sentences of Jeffrey Mims and Keith Stewart; because of an error patent, we vacate the sentence of Mark Mims and remand his case to the district court for resentencing.

PROCEDURAL HISTORY:
Defendants Mark A. Mims, Jeffrey Mims, Keith Stewart and Leroy Stewart were charged by grand jury indictment on August 5, 1993, with the first degree murder of Eddie Charles, a violation of La. R.S. 14:30. All four defendants pled not guilty at their August 10, 1993 arraignment. The trial court denied Mark Mims' motion to suppress his statement on November 4, 1994. The trial court also denied defendants' motion to suppress evidence; and it denied defendants' motion to reopen the hearing on the motion to suppress evidence on June 9, 1995.[1] This court denied defendants' application for supervisory writs as to that ruling on September 27, 1995.[2] On February 22, 1996, the trial court denied defendants' motions for speedy trial and to reopen the probable cause hearing. This court denied defendant's application for supervisory writs as to that ruling on March 20, 1996.[3] On February 22, 1996, the State amended the indictment to reduce the charge against the Stewarts to manslaughter. Keith and Leroy Stewart then pled guilty to the amended charge. Mark and Jeffrey Mims proceeded to trial and, on April 20, 1996, were found guilty of manslaughter by a twelve-person jury.
On June 25, 1996, the trial court sentenced Mark Mims to forty years at hard labor, barring him from the benefit of parole for five years.[4] Jeffrey Mims was sentenced to forty years at hard labor. Keith and Leroy Stewart were sentenced to ten years at hard labor. The trial court entered oral motions to reconsider sentence on behalf of all three appealing defendants. Amended minute entries for June 25, 1996, reflect that the trial court gave all three appealing defendants credit for time served and eligibility for good time and stipulated that Jeffrey Mims' sentence also be served without benefit of *51 parole for a period of five years.[5] The trial court denied the Mims' oral motions to reconsider sentence. All three appealing defendants made oral motions for appeal, to be supplemented by written motions. On July 9, 1996, the trial court denied the Mims' motion for new trial and their written motion to reconsider sentence. On July 10, 1996, the trial court adjudicated Mark Mims a second-felony habitual offender and, after defendant waived all legal delays, sentenced him to forty years at hard labor without benefit of probation, parole, suspension of sentence, or good time, but with credit for time served. The trial court granted defendant Mark Mims' oral motion for appeal. On February 5, 1997, the trial court granted an out-of-time appeal to Jeffrey Mims.[6] It granted an out-of-time appeal to Keith Stewart on April 7, 1997.[7] On April 29, 1997, it granted Mark Mims' order of appeal.[8]

STATEMENT OF FACTS:
The facts of this case are lengthy, conflicting and complex and thus require detailed recitation. Lillian Ann LeBoeuf testified that she arrived at her 5127 Cameron Blvd. home on the night of March 7, 1993, to find her son, Edward "Eddie" Charles, dead of gunshot wounds. She had last seen and spoken with him around 6:00 p.m. that evening. She stated that the Mims brothers were very good friends of Eddie; that she had known the brothers for almost all of their lives; that Mark Mims had lived with her and her son in the early part of 1970; that Eddie had been the best man in Mark Mims' wedding; and that Eddie was the godfather to Mark Mims' child.
New Orleans Police Homicide Detective Lance Reed testified that he led the onscene early morning investigation of the death of Eddie Charles. Det. Reed identified evidence related to that investigation, including photographs and a diagram of the scene; spent cartridge casings recovered near the victim's body; one live 9mm cartridge found in the street directly in front of the victim's residence; a black baseball cap with the letter "P"; and the victim's slippers and pajamas. Det. Reed said that the victim sustained multiple gunshot wounds. Det. Reed further testified that, later that evening, he viewed a television news broadcast concerning the arrest of armed individuals in the French Quarter and that he recognized a van displayed there as being similar to the description of one seen by a witness near the scene of the homicide. Det. Reed had the 9mm firearms seized in connection with the French Quarter arrests tested to determine whether one of them had been fired during the homicide. After receiving the test results, Det. Reed obtained arrest warrants for the Mims brothers, who by then had been released from police custody. Det. Reed stated on cross-examination that the live 9mm round was found later during the morning of the murder, after being pointed out by neighbors. He also stated that no fingerprints were found on the live round.
Dr. Susan Garcia, who was qualified by stipulation as an expert in the field of forensic pathology, performed an autopsy on the victim's body. She said the victim sustained six identifiable gunshot entrance wounds and two exit wounds, with wounds 4 and 6 both potentially fatal because of internal bleeding. All of the wounds were caused by bullets fired at least eighteen *52 inches from the entrance sites. Four projectiles were recovered from the body, correlating to wounds numbered 2, 3, 4 and 6. Dr. Garcia was able to mark her initial "G" on the base of each bullet except the bullet from wound 2. Dr. Garcia testified that she also performed an autopsy on the body of one Walter Ward, who was shot to death on June 30, 1995.
New Orleans Police Officer Michael Nievez testified that he was the first officer to arrive on the scene of the homicide in the early morning hours of March 7th. He assisted in recovering eight 9mm spent casings near or under the body. He testified that no weapon was found on or near the victim's body.
Adrian Charles, one of the victim's brothers, testified that he knew the Mims brothers. He went to the scene of the homicide where, in the morning light, he discovered a bullet lying in the street. He said that he asked someone to park an automobile to prevent other vehicles from disturbing it and that he notified police, who collected the bullet.
United States Border Patrol Agent Ramone Rivera testified that he and his partner were in New Orleans in March of 1993 to make a war-on-drugs presentation to school children. Agent Rivera and his partner walked around the French Quarter one night, consumed three beers, and returned to their hotel room at approximately 10:00 p.m. Agent Rivera returned to the French Quarter around 1:30 a.m., in search of a slice of pizza. He observed some individuals in black jackets and Oakland Raiders hats beginning to fight with some other individuals outside of a daiquiri shop. He saw a male draw a gun from the inside of his jacket. When the male turned around, he apparently dropped a magazine out of the gun. Agent Rivera said he walked alongside the male for about two blocks and informed him that he could get into significant trouble for carrying a concealed weapon. The male responded, "Hey, you better shut the f___ up, Mexican, or I'm going to pop you." Agent Rivera walked back to the location of the fight to find a group of people looking down at the ground. He then saw on the ground a magazine containing bullets, which he retrieved after identifying himself as a Border Patrol Agent. He subsequently approached a police officer, told him about the person dropping the magazine, and turned it over to the officer. As Agent Rivera was returning to his hotel room, he observed the individual with the gun and another individual inside of a black van. Agent Rivera wrote down the license plate number of the van and returned to give it to the police officer with whom he had earlier spoken, alerting him that the individual with the gun was inside of the van. At trial he identified the piece of paper plate on which he had written the license plate number. Agent Rivera viewed a photograph of a van and said its license plate number was the same as the number of the van in which he had seen the gunman. He identified Mark Mims in court as the gunman, remembering a distinctive mole or burn mark on the left side of Mims' cheek. On redirect examination, Agent Rivera said the gun Mark Mims pointed at him was a Beretta.
On cross-examination, Agent Rivera said he could not recall the exact date that he was in the French Quarter. He recalled that the initial confrontation he observed outside the daiquiri shop involved approximately fifteen individualsmales, females, blacks and whitesbut he could not remember how many were in each gender and ethnic category. Agent Rivera also admitted that he could not recall whether Mark Mims was driving the black van or was seated in the front passenger seat when he saw him again.
Former New Orleans Police Officer Bernard Mitchell testified that he was a police officer in March of 1993 and that he participated in the arrests of the Mims brothers on March 7th. He was sitting in another officer's patrol car at Iberville and Chartres Streets when he heard a radio broadcast that a black Chevrolet van, license *53 plate number T001028, with several armed subjects in it was being sought in connection with an aggravated assault. Within seconds, he observed the described van stopped on Iberville Street by Chartres Street. Officer Mitchell slid into the driver's seat of the patrol car and signaled to the other officer, and they followed the van to St. Louis and Bourbon Streets, where the van stopped behind another vehicle waiting to cross Bourbon. Officer Mitchell exited his vehicle, drew his firearm and approached the left rear of the van. At that time, Jeffrey Mims stuck his head and right arm out of the window and pointed a loaded 9mm Beretta handgun at the officer. Officer Mitchell ordered Mims to drop his gun, and Mims complied. Officer Mitchell identified a 9mm Beretta handgun in evidence, serial number BER014378, as the one seized from Jeffrey Mims.[9] The van was relocated to the Eighth Police District station due to the busy Saturday night Bourbon Street crowd. Officer Mitchell said the van contained a .44 caliber revolver, two 12-gauge shotguns, three AK-47 assault rifles, and a second loaded 9mm Beretta handgun. The Beretta seized from Jeffrey Mims had Pachmayer rubber grips on it; the second one did not. Officer Mitchell identified, without objection from the defense, all of the firearms seized from the van, numerous loaded magazines for the rifles, numerous rounds of ammunition, and a bayonet for one of the rifles. Bags of clothing and a briefcase containing U.S. currency were also recovered from the van. Officer Mitchell said he interviewed Agent Rivera at approximately 10:30 a.m., getting the agent to identify the piece of paper on which the agent had written down the license plate number of the van.
Officer Mitchell admitted on cross-examination that it was not a crime for the defendants to have all of those firearms and munitions in their possession. He also said that it was not a crime to have a large quantity of money in one's possession. Officer Mitchell did say that he was a victim of an aggravated assault that morning.
Former New Orleans Police Officer Mark McElvin was in the police car with Officer Mitchell when they stopped defendants' van on March 7th. He approached the passenger side front door, whereupon Mark Mims pointed an AK-47 rifle at him and then immediately lowered it, before the officer ordered him to do so. He pulled Mark Mims out of the vehicle and handcuffed him. Officer Letellier took control of Mark Mims, while Officer Nazar approached the sliding door of the van, ordering anyone else inside to come out. No one else was in the van. He said the van contained two brief cases, one black and one brown, two black suitcases, and two garbage bags. Officer McElvin prepared the search warrant application for the contents of the van. The brown briefcase contained a large sum of money, the black one a bayonet, jewelry, beepers and a cellular telephone. The suitcases and the garbage bags contained clothing. Officer McElvin said he participated in counting the money, which totaled approximately $39,000. He identified a photograph of Mark Mims and said Mims had a scuff mark or brush burn around his eye and some blood on one of his hands.
New Orleans Police Canine Officer Gary Lee testified that his drug-detecting dog searched the van and detected nothing. After officers placed items in the van, the dog alerted on some folded currency and a briefcase of currency. Officer Lee admitted that he had heard that $70,000 in currency was seized from the van, but he said he never handled any of the money.
New Orleans Police Lieutenant Louis Kistner testified that, as a sergeant assigned to the asset forfeiture division, he investigated the asset forfeiture aspect of the Mims brothers' arrest. He issued a receipt to the Mims for a total of $44,619 *54 in currency, along with jewelry, pagers and one cellular telephone.
Orleans Parish Assistant District Attorney Greg Hangartner testified that he handled the asset forfeiture proceedings transferring ownership of the currency and other items seized from the Mimses to the State of Louisiana, based on probable cause to believe that they were either the proceeds of narcotics trafficking, were purchased with things derived from the proceeds of narcotics trafficking, and/or were used to facilitate narcotics trafficking.
New Orleans Police Officer Kenneth Leary was qualified by stipulation as an expert in the field of firearms identification. He examined two 9mm Beretta pistols; eight spent cartridge cases collected from the homicide scene; and three bullets, two lead core bullet fragments and two copper jacket fragments recovered during the autopsy of the victim. Officer Leary determined that the eight spent cartridge casings and three bullets had all been fired by one of the Beretta pistols. However, he said it was impossible to determine whether the four fragments were fired from a particular firearm; thus, it was possible that they were fragments of the three other bullets that he was able to match or that they had been fired from another gun. Importantly, he identified the Beretta pistol with the "black" grips as the gun to which he matched the eight casings and the three recovered bullets.
Officer Leary identified the various other firearms recovered from the van, as well as magazines and ammunition. At trial, he examined the live cartridge found at the scene and said it was manufactured by Federal Cartridge Corporation, while he said that the bullets recovered from the victim's body and the spent cartridge casings were manufactured by Winchester. Officer Leary also said that Beretta pistols fire semi-automatically and sometimes can jam for several reasons, such as being fired when the shooter fails to lock his wrist.
Gay Mims Willis, Mark and Jeffrey's sister, testified that she purchased two 9mm Berettas for them for Christmas of 1990. She was shown one Beretta 9mm pistol and said it looked like one she had purchased. She was shown the murder weapon, with the black grips, and stated that she had never seen it before. The State introduced into evidence a federal firearms transaction form showing that a Gay Mims had purchased, in particular, a Beretta pistol, serial number BER014378Z; and Ms. Mims admitted that her signature was on the form.
Jeffery Michael "Mike" Charles, also a brother of the victim, testified that he knew the Mimses. He said the victim and Mark Mims operated a body shop business for approximately one year. A third person, Walter Ward, later came into the business. Jeffery Charles said Mark Mims wanted Eddie Charles out of the business, so Eddie Charles left. The business continued to operate for six to eight months afterward. Jeffery Charles said he once overheard Walter Ward say that he put a "tombstone" in the front yard of the home of Mark Mims' mother, and Jeffery Charles conveyed this information to "Bubba" Mims. Jeffery Charles said he had never heard Eddie Charles make any threats directed toward the Mimses.
Leo Wyre, Jr., the Mimses' cousin, testified that he had worked for Creative Concepts, the body shop once owned by Mark Mims and Eddie Charles. Wyre said he also knew Walter Ward. According to Wyre, one evening in March of 1993, Mark Mims and another individual, both dressed in black, entered Wyre's home and pulled guns on him and Zena Harris, who was then his girlfriend but was his wife at the time of the trial. Mark Mims, armed with a 9mm pistol, asked Wyre if he knew where Walter Ward was and then ordered Wyre to accompany him to look for Ward. Wyre, who had just gotten out of the shower, grabbed some clothes, put them in a plastic bag and left with the two men. They forced Wyre at gunpoint into a black *55 van, which was driven by Jeffrey Mims and occupied by a fourth individual. Wyre learned months later that the other two individuals were Keith and Leroy Stewart. Wyre noticed two AK-47s and a "Street Sweeper" in the van. At some point Mark opened a suitcase, telling Wyre it contained $200,000.
Eventually, having failed to locate Ward, Mark Mims decided to look for Eddie Charles. The five men eventually went to Eddie Charles' home, where Mark directed Jeffrey to walk Wyre up to the door and ring the doorbell. Wyre said Mark directed Jeffrey to shoot him if he did not cooperate. Eddie came outside, and Jeffrey drew his gun and started talking to Eddie. Wyre said he walked back down the driveway. The van pulled up, and Mark and Keith Stewart exited with guns and walked to Eddie's door. Wyre reentered the van and heard Eddie call out twice for his mother and approximately six subsequent gunshots. Jeffery, Mark and Keith returned to the van, and someone told Leroy Stewart to pull off slowly. Mark said his gun had jammed; Jeffrey and Keith Stewart said nothing.
The men then drove to the Carrollton area, again looking for Ward, but did not find him. Wyre said Mark wanted to shoot at the residence where Ward supposedly lived but did not because no one appeared to be home. The five men then proceeded to the French Quarter, parked the van on Iberville Street one block from Canal Street, and went into a daiquiri shop. Wyre said everyone was carrying a gun except him. Jeffrey became involved in an altercation with someone, and they left the daiquiri shop. Wyre began walking toward Canal Street, but Leroy and Keith Stewart caught up to him, and one of them told him to wait and see if the Mimses would catch up with them. The three walked to the Sheraton Hotel; Wyre accompanied the Stewarts because they were armed, though he admitted they did not force him. He stayed in a hotel suite with the Stewarts until they saw a news-cast reporting the Mimses' arrests. They then told Wyre he was free to leave.
Wyre said he was interviewed by a police officer in October and told him the story he told the court. He signed a statement and was booked with first degree murder for the killing of Eddie Charles, but the District Attorney's Office refused the charge the next month. Wyre said the charges were refused before he ever spoke with anyone from that office. Wyre did admit to a 1988 conviction for possession of stolen property.
Wyre testified on cross-examination that the clothes he took with him that night had been in a plastic drycleaner's bag, with his name on it, and that they were left in the van, leading to his eventual arrest. He admitted that Mark Mims had told him that a tombstone threatening Mark's life had been given to Mark's mother. Wyre said that on the night of the murder Keith Stewart and the Mimses were all armed with 9mm firearms. Wyre said that, when he parted company with the Stewarts, Keith Stewart gave him a few dollars and a 9mm firearm, which Wyre wrapped in a shirt and kicked under a sofa in the hotel. Wyre admitted that he knew the District Attorney's Office could recharge him. He told police that he believed that there had been a problem between Walter Ward and Mark Mims over a lawsuit, from which Mark had received a settlement and taken the money. He admitted telling police that Eddie Charles had been attempting to get Mark Mims to pay Ward the money allegedly owed to him. Wyre said the six shots he heard at the murder scene came in quick succession.
Zena Harris Wyre testified that, when she parked her car to go to Leo Wyre's residence on the night of March 7th, a dark, apparently black, van pulled up. As she walked toward Leo's door, she saw two black males walking up behind her. They asked if Leo was home, and one of them said to tell Leo that his cousin was asking for him. Mrs. Wyre identified Mark Mims in court as that person, whom she said she *56 had never seen before that night. The men pulled guns, and Mark told Leo that he had to go somewhere with them because someone was threatening Mark's mother. Leo resisted the idea, and the other individual told Mark to shoot Leo if he did not want to cooperate. The other individual pointed a gun at Mrs. Wyre, told her that she could not be trusted, and that she was also going to have to accompany them. Mrs. Wyre kneeled and pleaded with them not to take her. She said Leo was scared, pacing around as if he did not know which way to turn. Mrs. Wyre never called police about the incident but told Leo's parents the next morning, thinking that they should decide whether to call the police, as it involved Leo's cousin. Mrs. Wyre said on cross-examination that she did not see Leo again until the next evening, Sunday.
Orleans Parish First Assistant District Attorney Camille Buras, since elected as a criminal court judge, identified a screening form reflecting that the prosecutor in the instant case screened a first degree murder charge against Leo Wyre, and refused the charge. Ms. Buras testified on cross-examination that the decision not to prosecute a person arrested for a homicide is made by a panel of senior assistant district attorneys: the First Assistant District Attorney; the Chief of Screening; the Deputy Chief of Screening; the Chief of Trials; the Deputy Chief of Trials; and some other division heads who might be present at a particular charge conference. Ms. Buras said she was not aware of any deals made in exchange for the refusal of the charge and said she would have been aware of any such deals.
FBI Special Agent Robert Lee, of Houston, Texas, testified that he interviewed Mark Mims after Mims waived his Miranda rights. Mark told him that someone named Keith, who worked for Jeffrey Mims' auto body shop in Houston, approached him with a plan to purchase firearms in Houston for $3,000 and to sell them in New Orleans for $10,000. Mark and Jeffrey flew to Baton Rouge with the firearms on the Friday before their arrest, purchased a van there, and drove to New Orleans. They were traveling with $75,000. On Bourbon Street they met Keith, who took the van with all of the guns and said he was going to see about making the deal, while the Mimses waited in the French Quarter. Keith returned approximately thirty or forty minutes later and told the Mimses that the deal did not transpire because the purported buyer did not have the money. The Mimses left, and as they were driving through the French Quarter, police stopped them and placed them under arrest. Mark said he later learned that the guns were to be sold to Eddie Charles and informed Agent Lee that, if he had known that, he would not have participated in the deal. Mark said he believed the police must have taken approximately $30,000 of the money he and his brother had.
Agent Lee said Jeffrey Mims told a different story in several aspects. Jeffrey identified "Keith" as Keith Stewart. Jeffrey stated that all four menthe Mimses and Stewartshad flown from Houston to Baton Rouge. They checked into the Sheraton Hotel under Leroy Stewart's name, and the Stewarts took the van to sell the guns to someone named "Slick"; but they returned within two to three hours without completing the sale because the purported buyer did not have the money. Jeffrey stated, as had Mark, that if he had known the guns were to be sold to Eddie Charles he would not have participated in the deal. He also stated that he had $75,000 with him but had received a receipt from the police for only $44,000. Jeffrey said that Keith Stewart was known to carry a 9mm firearm. Agent Lee said that, as a result of the information obtained from the Mimses, Leroy and Keith Stewart were arrested; and Agent Lee subsequently interviewed Leroy Stewart.
FBI Agent Lloyd Diaz, also of Houston, also interviewed Jeffrey Mims after he waived his Miranda rights. Jeffrey gave *57 two statements. In the first one, he said that he and Mark Mims flew to Baton Rouge alone. In the second statement, he said that he, Mark and the Stewarts flew to Baton Rouge. In the first statement, Jeffrey said the two 9mm pistols owned by him and his brother were never out of their possession in New Orleans, and he speculated that police framed them in order to steal some of their money. In his second statement, he said that the Stewarts left in the van with "all" of the guns in order to complete the gun deal. Jeffrey admitted that he was aware that the guns were to be sold to someone who could not legally buy them. Agent Diaz testified on cross-examination that he did not believe Jeffrey was telling the truth when making either statement.
Leroy Stewart testified that he and his brother, Keith Stewart, worked for Creative Concepts in Houston, Texas. Keith asked him if he wanted to go to New Orleans; and Keith, accompanied by the Mims brothers, picked him up in Houston. There were some drugs in the car, which Mark Mims eventually gave to a woman named Sheila, whom they were supposed to meet later in Baton Rouge. Leroy said there were some guns in the trunk of the car; these were taken in suitcases on a flight to Baton Rouge. The four men rented a room at a Baton Rouge motel, and Mark Mims went to talk to Sheila. The other three men subsequently went to meet with someone, and when they returned they had a briefcase full of money: $89,000, Leroy was told. This briefcase had not been with them when they traveled from Houston to Baton Rouge.
The four then left for New Orleans to look for Walter Ward, someone unknown to Leroy. He drove Sheila to the airport in New Orleans, rented a nearby hotel room, and waited for the other three to pick him up. They picked him up in a black van and drove around, drinking and looking for Ward. They eventually went to Leo Wyre's residence, where Leroy and Mark Mims went inside with guns. Wyre left with them, and after an unsuccessful search for Ward, they drove to Eddie Charles' residence at the direction of Wyre. Charles' car was not there, so they left and returned later. At that time, Wyre and Jeffrey went to the front door, and Wyre returned to the van alone. Leroy heard Jeffrey yelling for help, and Mark Mims and Keith Stewart left the van to assist him. Leroy heard someone saying he did not have "anything to do with it," then heard two shots, followed by a number of shots. Leroy, who had gotten behind the wheel of the van, was preparing to drive off when Keith and the Mimses jumped back into the van. Mark said his gun had jammed, while Jeffrey asked if anyone had seen him "hit him." The five men went to the French Quarter, where Jeffrey got into an argument with a white male. Jeffrey and Mark disappeared, while Leroy, Keith and Wyre returned to the hotel. They learned that the Mimses had been arrested, and Leroy returned to Houston, while Keith stayed to wait for the Mimses to be released on bond. Leroy was indicted for first degree murder but pled guilty to manslaughter in exchange for his true testimony. He did not know what sentence he would receive, but he knew the sentencing range was from zero to forty years.
Leroy Stewart testified on cross-examination that the men drove around New Orleans for two or three days and could have left Houston three or four days before the shooting. He said that they all were wearing black clothing on the night of the shooting. Leroy Stewart admitted that he stayed in prison for approximately two and one-half years before entering into the plea agreement with the State. He also admitted that his second statement, in which he said Jeffrey Mims went to front door of Eddie Charles' residence, was given the day after he gave his first statement, in which he said that Mark Mims and Leo Wyre went to the door.
Keith Stewart testified that he worked with Jeffery Mims for approximately one *58 year at Mims' body shop in Houston. He said he recalled hearing Mark Mims say that he wanted to kill Walter Ward because Ward had threatened him. Jeffrey told him that Mark had supposedly been stopped by police and had drug money taken from him and that Ward did not believe him and wanted the money. Jeffrey also told him that Ward had sent a tombstone to the home of Mrs. Mims and a threatening letter to Houston. Keith Stewart said their plan was to come to New Orleans and to look for Ward; Eddie Charles was drawn into the events only at that last minute, when they could not find Ward. Mark Mims planned to sell five kilos of cocaine to someone in Baton Rouge and to use the money to pay back Ward. Stewart said he and the Mimses stole the cocaine from some Colombians. The three were armed at that time with 9mm pistols, Jeffrey's .44 magnum revolver, and three AK-47 rifles. When they bought the AK-47s, they had one of the Berettas fixed because it had been jamming.
In Houston, they picked up Leroy Stewart and met "Sheila" to give her the cocaine to drive to Baton Rouge. They then flew to Baton Rouge, and Leroy waited at the hotel with Sheila while Keith and the Mimses went to sell the five kilos of cocaine to "James" for $17,500 per kilo. They paid Sheila, and Leroy drove her to the airport. They then bought the van, spray-painted the windows black to keep people from seeing inside, and drove to New Orleans, checking into the Sheraton Hotel. They brought all of the guns upstairs, loaded them, and returned them to the van, after which they unsuccessfully searched for Walter Ward. Throughout their search, the two sets of brothers were all dressed in black clothing they purchased in New Orleans at a J.C. Penney department store. According to Keith Stewart, they did this because they believed it is difficult to identify black men in black clothing.
Eventually, the four went to Leo Wyre's residence, where Mark Mims and Leroy Stewart went inside and returned with Wyre. After continuing to search for Ward at several nightclubs, they drove past Eddie Charles' residence. They later returned and observed Charles' car parked there. Jeffrey Mims, gun in hand, and Wyre exited the van. Wyre knocked on the front door and asked Charles to come outside. When Charles came outside, Jeffrey appeared from around a corner of the house, still holding a gun, and grabbed Charles by the shirt. Charles began protesting that he did not have anything to do with the matter. Jeffrey began moving Charles toward the van, and Jeffrey called for help. Mark and Keith exited the van, and Mark began striking Charles in his head with a gun. Charles fell to the ground, and Keith attempted to pick up his legs when he was accidentally struck in the head by Jeffrey. Keith stepped back for a moment to regain his senses, when Mark shot Charles twice before his gun jammed. Jeffrey then shot Charles, and the three men ran back to the van.
Keith Stewart further testified that, after the shooting, the five men went to the French Quarter for drinks. At that point, Keith and the Mimses were armed with 9mm pistols. He saw Jeffrey engaged in a dispute with a white male outside a daiquiri shop. Mark pulled a gun on the individual, and then everyone separated. Keith said he, Leroy and Wyre returned to the hotel, where they eventually learned that the Mimses had been arrested. He gave Wyre some money and, over Wyre's protests, his 9mm pistol, and Wyre left. After the Mimses got out of jail, Keith traveled with them to Las Vegas and California.
Former New Orleans Police Officer Michael Nazar testified on behalf of defendants that, on March 7, 1993, he was assigned to a foot patrol on Bourbon Street. A person who identified himself as an off-duty federal agent approached and informed him that there were four to six *59 black males dressed in black commando gear carrying guns down Bourbon Street. He did not pay much attention to it until the agent came back, showed his identification and said the males were in a van. Nazar did not recall the agent's name, and the agent did not give him anything at that time. Nazar and his partner, Officer Nicholas Cook, proceeded to an intersection, where Nazar saw a van driving off. He notified the dispatcher and subsequently heard a radio call that officers were behind the van on St. Louis Street. Nazar approached the van and noticed Jeffrey Mims point a handgun out of the window. Jeffrey Mims was removed from the vehicle, and Officer Bernard Mitchell secured Mims' Beretta 92F pistol inside of his belt. Nazar observed Mark Mims attempting to get an AK-47 out of the window, and he was also brought under control. Nazar drove the van to the Eighth District Police station. There were two other 9mm pistols in the van: another Beretta and a Taurus. There was also a large amount of money in a black briefcase. On cross-examination, Nazar admitted to a prior conviction for aggravated battery, occurring after he left the police department. He also said on cross-examination that the Beretta pistol seized from Jeffrey Mims had black rubber Pachmayer grips on it.
Louisiana Attorney General's Office Criminal Division Investigator Reed Scott Bailey testified that he interviewed the Mimses' mother, Yvonne Mims, at her residence on April 10, 1996. He said she led him to her backyard where she turned over to him five pieces of concrete that, when put together, looked like a crude headstone. "Mark KKK" was written on the headstone.
Yvonne Mims testified that someone placed a headstone on her lawn in February or early March of 1993 and that, consequently, she and her family left the residence. Mrs. Mims stated on cross-examination that the headstone was left perhaps two weeks before she saw the television report of her sons' arrests. She admitted that she telephoned Mark Mims to report the incident to him. She said that after the headstone was found on her lawn, her husband talked to Eddie Charles' brother; and subsequently she, her husband, her mother and another of her sons, left town.
Eddie Mims, defendants' father, testified about the headstone found lying on his front lawn. He received a telephone call the next day from Mike Charleshe said he and Mike call each other "Bubba" regarding the headstone. As a result of these occurrences, Mr. Mims and his family left town for approximately eight days. Mr. Mims testified on cross-examination that Mike Charles was the brother of Eddie Charles. Mr. Mims said that he was not afraid of Mike Charles or Eddie Charles. When asked of whom he was afraid, Mr. Mims replied, "The other man." When asked if that person was Walter Ward, Mr. Mims said he thought it was.
Mark Mims testified that he used to own and operate Creative Concepts in New Orleans, which bought, sold and refurbished cars. His partners were Eddie Charles and Walter Ward, who was a silent financial partner. Mims stated that a misunderstanding arose with Eddie Charles regarding an insurance claim in the amount of $35,000; and Mims was severely beaten by Ward and a couple of his friends. As a result of this incident, Mark returned to Houston to work with Jeffrey Mims' business, the original Creative Concepts. He said that Jeffrey's business was restoring and reselling expensive foreign cars and that it occupied three and one-half acres. Ward showed up in Houston one day to discuss the insurance money, and Mark thought Ward left with the matter resolved, as Ward had received all the money that he could receive from the insurance claim. Eddie Charles also went to Houston, and asked Mark to come to his hotel room and discuss what had transpired with Ward, but Mark did not go.
In February of 1993, Mark heard that Ward had told Eddie Charles that Ward *60 was serious about collecting the money Mark owed him. Shortly thereafter, Mark's mother telephoned him about the headstone on her front lawn. Mark telephoned Marvin Charles, Eddie's brother in Atlanta, who informed him that Ward was serious in his demands. Eddie Charles subsequently informed Mark that Ward was demanding $50,000, as Ward had seen the business in Houston and knew Mark could get the money. Mark consulted with Jeffrey, and they decided to go to New Orleans to pay Ward. Mark said that they actually planned to pay Ward more than $50,000money which Jeffrey hadto ensure that Ward would leave their family alone. Mark said that, because he believed Ward to be dangerous, they decided to buy some weapons. However, they did not plan to confront anyone, but only to deliver the money.
Mark denied any allegations of acquiring drugs from Colombians. He said he eschewed the drug life, fled New Orleans because he found out how Ward obtained his money, and wanted nothing to do with that life. They rented a Lear jet to fly the guns and money to Baton Rouge, where they rented a van, drove to New Orleans, and checked into the Sheraton Hotel. They then went to Wyre's residence, whereupon Wyre, who he said had a gun, voluntarily accompanied them. Neither he nor Leroy Stewart pulled a gun at Wyre's residence.
Later, they simply drove to Eddie Charles' residence with the money, planning to settle the debt and return to Houston. Eddie did not appear to be there, so they unsuccessfully searched for him at some nightclubs. When they returned to Eddie's residence, Mark went alone to the door, carrying $85,000 in a briefcase. Eddie informed him that Ward had nothing to do with the money and that he, Eddie, wanted it instead. He and Eddie became involved in a scuffle and fought over Mark's gun, which fell onto the sidewalk. Keith and Leroy Stewart came up, and Leroy pushed Mark away, while Keith picked up the gun and shot Eddie.
Mark testified that Eddie Charles had christened his first child; that he had known Eddie his whole life; and that he did not want anyone to shoot Eddie. He said that after the shooting the three ran back to the van and went to the French Quarter. He did not want to tell the police that Keith had shot Eddie, because he felt Keith had acted to protect him. He implicitly denied pulling an AK-47 on a police officer. He was told police had seized some $44,000 from them. He admitted that Jeffrey had wired some $15,000 to Houston before their arrests.
On cross-examination, Mark stated that Eddie Charles had been the best man at his wedding; that Eddie was the godfather to one of his children; and that he had lived with Eddie and Mrs. Charles for a period of time. While he admitted being on Bourbon Street after the shooting, he denied going to a daiquiri shop or drawing a gun. He said he had never seen Agent Rivera before the trial. He admitted that they purchased the black van in Baton Rouge at a muffler shop, as one of the Stewart brothers had testified. He denied meeting anyone in Baton Rouge named Sheila or knowing a Sheila. He said the dispute with Ward over the money occurred in 1989. He denied taking drugs from Ward or owing Ward $50,000 for drugs and telling him that police had taken it. He admitted that he lied to the FBI.
Jeffrey Mims testified that in February and March of 1993, he owned and operated Creative Concepts in Houston. Mark informed him of the threats against their parents and resolved to pay off the people responsible. Jeffrey was angry with his brother because of some of Mark's relationships. Jeffrey said that he always tried to do the right thing and associate with good people. He claimed that he was arrested for the homicide while paying traffic tickets in Houston.
Jeffrey testified on cross-examination about the extent of his business. He had *61 approximately ten regular employees, an inventory of at least one hundred cars, and a monthly payroll of $20-22,000. Over ten to fifteen years he had operated other businesses and had accumulated the cash he took with him to New Orleans; he often used cash to make business purchases, such as a automobiles. He was presented, however, with his 1992 federal income tax returns showing a total contract labor cost for that year of $10,031; $42,360 gross profit; and $72,300 total income for him and his wife.
Jeffrey admitted that there were inaccuracies in his first statement to the FBI. He said he was in the van when Eddie Charles was shot and did not see who shot him. He denied pointing a gun at anyone and said Mark did not have an AK-47 when the police approached the van. He also denied that they painted the van windows black. He did admit to wiring money to his wife from Baton Rouge. He denied knowing a woman named Sheila Newman or spending any time with a woman in Baton Rouge. He denied that either he or Mark got into a fight in the French Quarter and said that, to the best of his knowledge, neither the Stewarts nor Wyre got into a fight there.
Jeffrey believed that Wyre came with them voluntarily. Jeffrey said he drove the van to Eddie Charles' residence, while Mark walked to the front door with the briefcase of money. He heard arguing, and the Stewart brothers ran out, leaving him and Wyre in the van. He subsequently heard repeated gunshots, and Mark and the Stewarts ran back to the van. Nothing was said as they drove away, but Mark told him in the French Quarter that Keith Stewart shot Eddie.
Dennis Olvany, a supervisor with the state probation and parole office, testified regarding factors his office considers when making a sentence recommendation in a presentence investigation report. He said that the length of time a person has already served in jail awaiting trial or other disposition prior to a plea of guilty is not a factor in recommending a sentence.

ERRORS PATENT; MARK MIMSASSIGNMENT OF ERROR NO. 3;

MARK MIMSPRO SE ASSIGNMENTS OF ERRORS NOS. 1-3:
A review of the record reveals a number of errors patent.
The trial court adjudicated defendant Mark Mims a second-felony habitual offender and sentenced him without vacating the original sentence. The failure of the trial court to vacate a defendant's original sentence before sentencing him as a habitual offender is a patent error requiring that the habitual offender sentence be vacated and the case remanded for resentencing. State v. Anderson, 97-2587, pp. 2-3 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 17.
In sentencing Mark Mims as a habitual offender pursuant to La. R.S. 15:529.1, the trial court also stipulated that his sentence be served without benefit of parole, suspension of sentence, or good time. La. R.S. 15:529.1(G), as in effect at the time of the offense, provided that a sentence under the Habitual Offender Law be without benefit of probation or suspension of sentence only. Therefore, the trial court properly stipulated that the sentence be without benefit of suspension of sentence. The failure to stipulate that the sentence be without parole, however, created an illegally lenient sentence. However, as the State has failed to appeal the issue, it may not be corrected on appeal. See State v. Webster, 98-0807, p. 3 (La.App. 4 Cir. 11/10/99), 746 So.2d 799, 801.
Mark Mims was sentenced for manslaughter, a violation of La. R.S. 14:31, which, at the time of the offense, did not contain any provision requiring that a sentence for that offense be served without benefit of parole or good time, or any provision permitting the trial court to deny a defendant those benefits.
*62 All the errors patent except the failure to vacate the original sentence before imposing the habitual offender sentence are rendered moot, as the habitual offender sentence must be vacated and the case remanded so the trial court can vacate the original sentence before resentencing defendant as a habitual offender.
The trial court originally sentenced Mark and Jeffery Mims on June 25, 1996. A minute entry reflects that the trial court denied the Mimses' motion for new trial on July 9, 1996. A motion for new trial must be filed and disposed of before sentencing. La.C.Cr.P. art. 853. However, La.C.Cr.P. art. 852 mandates that a motion for new trial be in writing, and there is no evidence that a written motion was ever filed by the Mimses, much less filed before sentencing. Nor is there any evidence that an oral motion for new trial was filed before sentencing. Thus, there is no patent error regarding the trial court's sentencing of the Mims relative to any post-sentence ruling on an untimely motion for new trial.
In his third pro se assignment of error, Mark Mims claims that the trial court erred in denying him eligibility for pardon. The sentencing transcript reflects that the trial court started to deny Mims the benefit of pardon, then corrected itself to order that the sentence be served without benefit of parole, suspension or good time. Thus, the trial court did not deny defendant eligibility for pardon.

MARK MIMSASSIGNMENT OF ERROR NO. 1; JEFFREY MIMSASSIGNMENT OF ERROR NO. 3; JEFFREY MIMSPRO SE ASSIGNMENT OF ERROR NO. 3:
By these assignments of error, Mark and Jeffrey Mims claim that the trial court erred by refusing to reopen the hearing on their motion to suppress.
La.C.Cr.P. art. 703(F) provides that a pretrial ruling on a motion to suppress the evidence "is binding at trial." In State v. Landry, 339 So.2d 8 (La.1976), the court held that it was error for the trial court to allow the State a rehearing on a pretrial ruling in favor of the defendant on a motion to suppress the evidence, where the State sought to introduce additional evidence. In State v. Thompson, 448 So.2d 666 (La.1984), reversed on other grounds by Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409 (1984), the Louisiana Supreme Court noted that Landry suggested that a defendant may not seek a rehearing to introduce new evidence once a trial court denies his motion to suppress. However, the court did not definitively resolve the issue, since the defendant in Thompson merely sought reargument and reconsideration of the motion based upon the evidence previously introduced. The court held that allowing the trial court to permit reargument and reconsideration of the merits of the motion to suppress was not an abuse of discretion. However, a prior ruling by the court in State v. Cole, 434 So.2d 1103 (La.1983) seemingly contradicts the dicta in Thompson regarding the reopening or rehearing of a motion to suppress to introduce new evidence. In Cole, the court held that the issue of whether to permit a trial to reopen a suppression hearing prior to trial "properly addresses itself to the discretion of the trial judge." Id.
Assuming for the sake of argument that Cole is a proper statement of the law, defendants have failed to show that the trial court abused its discretion in failing to reopen the suppression hearing. The trial court held a hearing on defendants' motion to reopen the suppression hearing. Defendants claimed that police had stopped a burgundy-colored van occupied by six black males in the 700 block of Toulouse Street in the French Quarter at around the same time as defendants were stopped, as purportedly reflected by entries in a New Orleans Police Department complaint history. The trial court ruled that, considering the evidence previously adduced, in addition to the new allegations *63 concerning the purported other stop, its ruling would not have been any different.[10]
Testimony at trial supported the trial court's ruling denying the motion to reopen the motion to suppress hearing. The police complaint history was obviously erroneous on several points. First, there was no burgundy van stopped in the 700 block of Toulouse by unit 811 at 0234 hours as reflected by the complaint history. Former New Orleans Police Officer Bernard Mitchell testified that he was unit 811 and that he followed a black van from Iberville and Chartres Streets, incorrectly reporting to the dispatcher that the van had turned from Chartres Street onto Toulouse Street, when it had actually turned onto St. Louis Street. The complaint history reflects that at 0238 hours, unit 886 apprehended two black males with guns. Unit 886 was Officer Michael Nazar, who was on foot patrol and assisted Officer Mitchell and his partner in arresting defendants. The reference to two black males is obviously a reference to the Mimses.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 1:
By this assignment of error, Jeffrey Mims claims the evidence was insufficient to support his conviction for manslaughter. This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987). *64 98-0011 at pp. 13-14, 744 So.2d at 106-107 (quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228).
Defendants were charged with first degree murder but were found guilty of the lesser included offense of manslaughter. La. R.S. 14:31 defines manslaughter in pertinent part as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection....
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person;
. . .
La. R.S. 14:30 defines first degree murder in pertinent part as the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, or simple robbery.
La. R.S. 14:30 defines second degree murder in pertinent part as the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
It was the State's theory of the case that defendants kidnapped Leo Wyre before the death of Eddie Charles. Both aggravated kidnapping, La. R.S. 14:44, and second degree kidnapping, La. R.S. 14:44.1, define kidnapping as:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
La. R.S. 14:44 defines aggravated kidnapping as a kidnapping "with the intent thereby to force the victim ... to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control." Under La. R.S. 14:44.1, a second degree kidnapping is one wherein the victim is, among other things, "[u]sed to facilitate the commission of a felony" or "[i]mprisoned or kidnapped when the offender is armed with a dangerous weapon...."
La. R.S. 14:27(A) provides for attempts and states:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
As there were four defendants involved in the incidentthe Mimses and the Stewarts the law of principals is applicable. La. R.S. 14:24 states:

*65 All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
A principal must knowingly participate in the planning or execution of the crime; mere presence at the scene is not enough. State v. Pierre, 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428. A person may only be convicted as a principal for a crime for which he personally has the requisite mental state or intent. Id.; see also State v. Graves, 96-1537, p. 7 (La.App. 4 Cir. 9/10/97), 699 So.2d 903, 907 (citing State v. Holmes, 388 So.2d 722 (La.1980)).
Jeffrey Mims claims solely that the State failed to establish that he had the specific intent to kill or inflict great bodily harm on the victim, asserting that, other than the testimony presented, there is no evidence linking him to the homicide.
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1); State v. Hampton, 94-1943, p. 4 (La.App. 4 Cir. 12/27/96), 686 So.2d 1021, 1024, writ denied, 97-0166 (La.6/13/97), 695 So.2d 986. Specific intent can be formed in an instant. State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390. Specific intent need not be proven as fact but may be inferred from the circumstances and actions of the defendant. State v. Maxie, 93-2158, p. 11 (La.4/10/95), 653 So.2d 526, 532. "General intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La. R.S. 14:10.
Leo Wyre and his wife both testified that Mark Mims and Leroy Stewart brandished guns in Leo's residence and forced Leo to accompany them in their search for Walter Ward. Mr. Wyre further stated that when the group eventually ended up at Eddie Charles' residence, he was forced to accompany Jeffrey Mims to Charles' front door and knock on it to lure Charles outside. Wyre said that Mark told Jeffrey to shoot Wyre if he did not cooperate. In addition, Leroy and Keith Stewart both testified that Jeffrey and Wyre approached Charles' residence, although Keith admitted that, in his first statement to the FBI, he had said that Mark had gone to the front door with Wyre.
Wyre stated on cross-examination that Jeffrey was armed with a 9mm pistol that night. Wyre testified that, after Charles came outside, Jeffrey drew a gun, held it on Charles, and began talking to him. Keith Stewart said that Jeffrey pulled a gun and grabbed Charles. Wyre and both of the Stewarts testified that Mark Mims and Keith Stewart exited the van and went up to Charles and Jeffrey. Wyre said that, after he got back into the van, he heard Charles call out twice for his mother, followed by the sound of approximately six gunshots. Keith said that Mark shot Charles twice before his gun jammed and that Jeffrey then shot Charles. Wyre testified that Jeffery, Mark and Keith returned to the van and that Mark said that his gun had jammed; Jeffrey and Keith did not say anything. Leroy Stewart confirmed that Mark said that his gun jammed, but he also said that Jeffrey asked if anyone had see him "hit him." Police later found a live 9mm cartridge in the street in front of Charles' residence, indicating that Mark may have cleared the jam in his gun as he was nearing the van after the shooting, ejecting the live round onto the street in the process. Leroy Stewart testified that the Mimses had one of the Beretta 9mm pistols repaired in Houston before the trip to New Orleans, because the gun kept jamming. Keith Stewart, Wyre and *66 Agent Rivera all testified that Jeffrey got into a fight with someone in or outside of a daiquiri shop in the French Quarter and that Mark Mims pulled out a gun in response.
Defendant asserts in his brief that ballistics evidence excluded Jeffrey Mims' "weapon" as the murder weapon. This assertion is based on Mark Mims' testimony that the Beretta with the black grips and the serial number BER014378Z the murder weaponbelonged to him, while the second Beretta belonged to Jeffrey. However, the evidence established that Jeffrey was in possession of the Beretta with the black grips when he was arrested in the French Quarter. Gay Mims admittedly bought Jeffrey and Mark Mims 9mm Berettas for Christmas in 1990, the serial numbers of which were B41732Z and BER014378Z. Officer Leary testified that three bullets recovered from Charles' body, and eight spent cartridge casings found near Charles' body, had been fired by the 9mm Beretta with the "black" grips. He said the other 9mm Beretta that he tested had brown grips. Officer Mitchell testified that, when he approached the van which Jeffrey was driving that night in the French Quarter, Jeffrey pointed a 9mm Beretta at hima Beretta with rubber Pachmayer grips. He said there was no doubt in his mind that he took the Beretta with rubber Pachmayer grips from Jeffrey. He testified that the serial number of that Beretta was "BER014378," inexplicably leaving off the final character, the letter "Z."[11] Officer Nazar, who saw Jeffrey pointing the gun, testified that it was a 9mm Beretta with "black" rubber Pachmayer grips.
Agent Diaz testified that in his first statement to the FBI, Jeffrey said that the two Berettas never left his and Mark's possession. In his second statement, Jeffrey changed his story, stating that the Stewarts took the van with "all" of the guns when they purportedly went to sell the other guns, which sale was never completed. Officer Mitchell testified that only two 9mm Berettas were seized from the van. According to Officer Mitchell, the only other handgun seized from the van at the time of the Mims' arrests was a .44 magnum caliber revolver. This handgun had been purchased by Jeffrey in 1989.
Keith Stewart testified that he had a 9mm Taurus gun, which he gave to Leo Wyre after the Mimses had been arrested and when Wyre was leaving the Sheraton Hotel to return home. Wyre testified that, when they went to the daiquiri shop, everyone but him had a gun. Keith said only that, when they were in the French Quarter, he and the Mimses were all armed with 9mm handguns. Wyre said that, when Leroy Stewart and Mark Mims came to his residence, Leroy was armed; but he also stated at one point that only Jeffrey, Mark and Keith had 9mms that night. Thus, the evidence indicates that only three 9mm handguns were present that night: the two Berettas owned by the Mimses and the Taurus in the possession of Keith Stewart. One indisputable murder weapon was the 9mm Beretta with black grips, as eight casings from it were found at the scene and three bullets from it were recovered during the autopsy. The only evidence that directly placed this pistol in the possession of any of the five men that night placed it in the hands of Jeffrey Mims several hours after the murder. In addition, testimony placed him in possession of a 9mm pistol at other times that night.
Considering all of the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Jeffrey Mims was armed that night with the murder weapon; and it could have further found beyond a reasonable doubt that he used that gun to fire several bullets at Charles, having *67 formed at the moment he fired those shotseven if only for an instantthe specific intent to kill or inflict great bodily harm on Charles.
Accordingly, although Jeffrey primarily argues that the State produced insufficient proof of specific intent, we believe that, considering all of the evidence in the light most favorable to the State, a rational trier of fact could have found that Jeffrey was a principal to the aggravated or second degree kidnapping of Leo Wyre, during which kidnapping he shot and killed Charles, having the specific intent to kill or inflict great bodily harm, as supported by the firing of multiple bullets. As for the manslaughter verdict, "[i]f the evidence adduced at trial was sufficient to support a conviction of the charged offense, the jury's verdict is authorized." State v. Harris, 97-2903, p. 8 (La.App. 4 Cir. 9/1/99), 742 So.2d 997, 1001. Thus, because there was sufficient proof for the jury to convict Jeffrey of first degree murderincluding sufficient proof of his intentthe responsive manslaughter verdict was authorized.
Moreover, considering all of the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Jeffrey was a principal to the aggravated or second degree kidnapping of Wyre, during the course of which Charles was killed. This would constitute second degree murder, or "felony-murder," a crime for which specific intent to kill or inflict great bodily harm was unnecessary. Considering the threats made on Jeffrey's parents and family, the jury could have generously given him the benefit of any and all doubt, felt that he committed the homicide in sudden passion or heat of blood, and thus found him guilty of manslaughter pursuant to La. R.S. 14:31(A)(1)or the jury could have simply returned a "compromise verdict" of guilty of manslaughter.
The evidence also would support a manslaughter conviction pursuant to La R.S. 14:31(A)(2)(a), with Jeffrey having committed the homicide in the course of threatening Charles with a guni.e. an aggravated assaultin violation of La. R.S. 14:37, which is an intentional misdemeanor directly affecting the person. However, while the trial court instructed the jury as to this intentional misdemeanor manslaughter, it did not instruct the jury as to the elements of any applicable misdemeanor.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 2:
By this assignment of error, Jeffrey Mims claims the trial court erred in denying his motion to suppress the evidence, arguing that officers did not have reasonable suspicion to stop the van.
A trial court's ruling on a motion to suppress the evidence is entitled to great weight because the court may observe the witnesses and weigh the credibility of their testimony. State v. Jones, 97-2217, p.10 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 395, writ denied, 99-1702 (La.11/5/99), 751 So.2d 234.
La. C.Cr.P. art. 215(A) provides that:
A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
"Reasonable suspicion" to stop is something less than the probable cause required for an arrest, and the reviewing court must look to the facts and circumstances of each case to determine whether the detaining officer had sufficient facts within his knowledge to justify an infringement of the suspect's rights. State v. Littles, 98-2517, p. 3 (La.App. 4 Cir. 9/15/99), 742 So.2d 735, 737. In assessing the reasonableness of an investigatory stop, the court must balance the need for the stop against the invasion of privacy that it entails. See State v. Harris, 99-1434, pp. 2-3 *68 (La.App. 4 Cir. 9/8/99), 744 So.2d 160, 162. The totality of the circumstances must be considered in determining whether reasonable suspicion exists. State v. Mitchell, 97-2774, p. 9 (La.App. 4 Cir. 2/3/99), 731 So.2d 319, 326. The detaining officers must have knowledge of specific, articulable facts, which, if taken together with rational inferences from those facts, reasonably warrant the stop. State v. Keller, 98-0502, p. 2 (La.App. 4 Cir. 3/10/99), 732 So.2d 77, 78. In reviewing the totality of the circumstances, the officer's past experience, training and common sense may be considered in determining if his inferences from the facts were reasonable. State v. Williams, 98-3059, p. 3 (La.App. 4 Cir. 3/3/99), 729 So.2d 142, 144. Deference should be given to the experience of the officers who were present at the time of the incident. State v. Ratliff, 98-0094, p. 3 (La.App. 4 Cir. 5/19/99), 737 So.2d 252, 254, writ denied, 99-1523 (La.10/29/99), 748 So.2d 1160. "In reviewing a trial court's ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case." State v. Nogess, 98-0670, p. 11 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 137.
U.S. Border Patrol Agent Rivera testified at trial that he observed Mark Mims draw a gun from underneath his jacket during an altercation between two individuals on Bourbon Street, one of whom, according to Leo Wyre, Keith Stewart and Leroy Stewart, was Jeffrey Mims. It was reasonable to interpret that action as an aggravated assault on the person with whom Jeffrey was involved in an altercation and/or on that person's companions. An aggravated assault is an attempt to commit a batteryan intentional use of force or violence upon anotheror the intentional placing of another in reasonable apprehension of receiving a battery, committed with a dangerous weapon. La. R.S. 14:36-37. Agent Rivera also testified that Mark subsequently threatened to shoot him.
Agent Rivera communicated to Officer Nazar the actions of Mark Mims in pulling the gun out, along with the fact that Mims was in a black van. Officer Nazar alerted the police dispatcher. Officer Mitchell heard the radio dispatch that several black males with guns in a black Chevrolet van were being sought in connection with an aggravated assault. When Officer Mitchell saw a van fitting the description minutes later, only blocks from Bourbon Street, he had reasonable suspicion to believe that one or more individuals inside had committed a crimei.e. aggravated assaultand that a gun used in that crime was inside of the van. Thus, the police lawfully stopped the van. Jeffrey makes no argument concerning the subsequent warrantless search of the van and seizure of the contents therein. However, we note for the sake of completeness that, under the well-established "automobile exception" to the warrant requirement, police officers who have probable cause to believe that a vehicle contains evidence of a crime may search it without first obtaining a warrant. See, e.g., United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); State v. Tatum, 466 So.2d 29 (La.1985).
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 4; JEFFREY MIMSPRO SE ASSIGNMENT OF ERROR NO. 2:
By this assignment of error, Jeffrey Mims claims that the trial court erred in denying his motion to recuse on the ground that the court's minute clerk participated in a plea bargain agreement with the Stewart brothers.
La. C.Cr.P. art. 671 sets forth the grounds for recusal of a judge and provides in pertinent part:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:

*69 (1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(4) Is a witness in the cause;
(5) Has performed a judicial act in the case in another court; or
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
A trial judge is presumed to be impartial. State v. Edwards, 420 So.2d 663, 673 (La.1982); State v. Parker, 96-1852, p. 15 (La.App. 4 Cir. 6/18/97), 696 So.2d 599, 607, writ denied, 97-1953 (La.1/9/98), 705 So.2d 1097. For a defendant to be entitled to the recusal of a judge in a criminal case on the grounds of bias or prejudice, the claim must be of a substantial nature, based upon more than conclusory allegations. Id; State v. Walton, 469 So.2d 1204, 1206 (La.App. 4 Cir. 1985).
The trial court conducted a hearing on the motion for recusal, during which Jake Lemmon, the court's minute clerk, testified that, on or about February 6, 1996, he spoke to the Stewarts in jail to inquire into their claims that they had not been able to contact their parents. Mr. Lemmon explained that the Stewarts were not satisfied with their attorney and wished to communicate with their parents about this issue. Mr. Lemmon said he informed the Stewarts that, if they wished to retain different counsel but could not afford private counsel, the court would appoint new counsel. Mr. Lemmon flatly denied ever discussing a plea agreement with them on that occasion. Following Mr. Lemmon's testimony, the trial judge noted that his recollection was that the previous day he had instructed the Stewarts to use the telephone to inform their parents that they wished to employ counsel to represent them. The trial judge further stated that, in the event the Stewarts had not employed another attorney, he had intended to appoint a particular attorney to represent them.
Keith Stewart testified that, as of February 5, 1996, he, his brother and their mother no longer trusted the attorney who had been representing them. He said on February 6, 1996, Mr. Lemmon came to jail to ask on behalf of the court whether he and Leroy had obtained another attorney. He denied that Mr. Lemmon discussed the issue of a plea bargain, or a plea to a charge of manslaughter, and said the conversation lasted three or four minutes. He said he did mention to Mr. Lemmon something about pleadings he had filed in the court, as to which he not received a response.
Leroy Stewart testified that Mr. Lemmon came to jail to ask if they had obtained an attorney yet and that they inquired about something they had filed in the district court and/or the Louisiana Supreme Court. Asked about a plea deal, Leroy said that that had been taken care of before the date of the visit by Mr. Lemmon. The prison log book was introduced into evidence, indicating that Mr. Lemmon signed in at 2:30 p.m. and left at 3:15 p.m. Jake Lemmon was recalled as a witness to deny that he had signed his name on log book and to reiterate that he was with the Stewart brothers for only one minute. He said he also spoke to the deputy while he was there that day.
We agree with defendant that court personnel should never engage in direct, ex parte communications with a *70 defendant, for whatever reason, as such communications may create suspicions of impropriety. Consequently and moreover, it is improper for a court functionary to engage in ex parte plea bargaining with a defendant. One of principal safeguards of a defendant's right to a fair trial is the public nature of the proceedings against him. Similarly, the recordation of those proceedings protects a defendant's right to a fair and meaningful review of his trial or of his decision to enter a guilty plea. For example, La. C.Cr.P. art. 843 mandates that all felony proceedings be recorded; and art. 556.1 provides in pertinent part:
A. In any criminal case, the court shall not accept a plea of guilty or nolo contendere without first addressing the defendant personally in open court ....
(Emphasis added.)
Here, however, defendant Jeffrey Mims failed to rebut the presumption of the trial court's impartiality and, thus, to set forth a valid ground for recusal. There is no evidence that the trial judge acted improperly or that the trial court was biased in favor of the Stewarts and against Jeffrey Mims. While the minute clerk's actions were improper, his testimony regarding the purely administrative purpose of his visit to the Stewarts notwithstanding, there is no evidence of resulting prejudice to Jeffrey. Therefore, we cannot say that the court's denial of Jeffrey Mims' motion to recuse was an abuse of discretion.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 5:
By this assignment of error, Jeffrey Mims argues that the trial court erred in admitting detailed descriptions of the weapons found in the van he was driving at the time of his arrest. Defense counsel objected during trial when the firearms examiner, Officer Leary, started testifying as to the velocity of the bullet fired by an AK-47; the number of rounds of ammunition the rifle was capable of firing; and to the officer's characterization of the rifle as a high-powered weapon. The basis of defendant's argument was that Officer Leary had not tested any guns besides the two Beretta pistols and that Officer Leary's detailed testimony was "more prejudicial than anything," meaning that any relevance of such evidence was outweighed by its prejudicial effect. In making his objection, defense counsel acknowledged that the jury had already seen the evidence. The State countered by stating that such testimony went to the defendant's state of mind. The trial court denied the objection, and Officer Leary continued to testify in detail concerning the firearms and accoutrements seized from the van, with Jeffrey Mims' counsel again raising an objection at a later time.
Jeffrey Mims argues on appeal that the probative value of such evidence was substantially outweighed by its prejudicial effect, and he also disputes that the evidence was relevant to show his state of mind.
Relevant evidence, which is generally admissible, is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. arts. 401-402. One exception to the rule of general admissibility is La. C.E. art. 403, which provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
A trial court's ruling as to relevance will not be disturbed absent a clear abuse of discretion, State v. Lewis, 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1017; and a trial court is accorded similar deference in balancing the probative value of relevant evidence against its prejudicial effect and in determining whether the former is substantially *71 outweighed by the latter. See State v. Lambert, 98-0730, p. 29 (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755.
The State's theory, in part, was that the Mimses and Stewarts came to New Orleans with extensive armaments to resolve their dispute with Walter Ward, a reputed drug dealer who once had Mark Mims severely beaten and who was threatening lives of members of the Mims family, including defendants' parents. The inferences to be drawn from the presence of the armaments were that the Mimses and Stewarts came to New Orleans intending to kill or inflict great bodily harm on Walter Ward and that they killed Eddie Charles in the course of their hunt for Ward. To that end, evidence as to the extent and destructive capacity of the firearms cache amassed by the Mimses in Houston and kept with them during their hunt in New Orleans was technically relevant to Jeffrey Mims' state of mind on the night of the killing of Charles.
Evidence as to the firearms and other items found in the van was admitted without objection before Officer Leary testified, and Jeffrey Mims makes no argument regarding the admissibility of this evidence. The jury knew the Mimses were in possession of three AK-47s; two 12-gauge shotguns; a .44 magnum handgun; two Beretta pistols; and magazines, ammunition and bayonets. Officer Leary elaborated on the operation of the AK-47 rifles; the velocity of the ammunition fired from those rifles; and the number of rounds of ammunition the guns were capable of firing, depending on the magazine used. He commented on the velocity of the .44 cartridge, as well as the operation of the 12-gauge pump-action shotgun and the 12-shot, 12-gauge "Street Sweeper" shotgun. He described the "Dragon's Breath" shotgun shell, which emits a large burst of flame upon discharge, as opposed to lead projectiles. He explained that the two 30-round AK-47 magazines found taped together allow a person to expend one magazine and immediately withdraw the empty one, flip the taped magazines over, and insert the full one. Officer Leary went on to comment, in response to questioning by the State, on a bayonet found in one of the briefcases, which he said could be affixed to an AK-47.
Eddie Charles was shot with a 9mm Beretta handgun. Those at the immediate scene of the homicide, Jeffrey and Mark Mims and Keith Stewart, were all armed with 9mm handguns. There was absolutely no testimony that any of the AK-47s or shotguns were ever even taken out of the van at Charles' residence, much less that they played a role in the homicide. In fact, the only role any of those firearms actively played in New Orleans involved one AK-47 rifle, which Mark Mims allegedly attempted to raise and point at Officer McElvin when the Mimses were arrested in the van several hours after the homicide.
In State v. Wallace, 612 So.2d 183, 187 (La.App. 1 Cir.1992), writ denied, 614 So.2d 1253 (La.1993), the defendant contended that a machine pistol that was not the murder weapon, and all "physical evidence and testimony associated with it, was irrelevant and prejudicial." The court held, however, that the machine pistol had some relevance because the defendant's possession of it and cocaine at the time of his arrest tended to negate a claim that he was considering surrendering to the police for the murder, which defendant attempted to portray as a justified act. While stating that the issue was close, the court held that La. C.E. art. 403 did not bar the introduction of the machine pistol and, even if it did, that the error was harmless beyond a reasonable doubt, citing La. C.Cr.P. art. 921.
Considering the facts and circumstances of the instant case, it is not unreasonable to argue that the minimal probative value of Officer Leary's detailed technical testimony concerning the weapons and accoutrements was substantially outweighed by its prejudicial effect. However, *72 we are unwilling to say that the trial court, which was in the optimal position to evaluate the impact of the testimony on the jurors, abused its considerable discretion in applying La. C.E. art. 403. Moreover, even if we assume that the trial court did abuse its discretion, we must conduct a harmless error analysis, determining whether the admission of the testimony was harmless beyond a reasonable doubt. La. C.Cr.P. art. 921; State v. Everidge, 96-2665, p. 8 (La.12/2/97), 702 So.2d 680, 685.
It is clear that the jury knew about the guns, ammunition and accoutrements before Officer Leary testified; and it was conceded by a police officer during trial that all of the guns, ammunition and accoutrements found in the van were legally possessed by the Mimses. The jury knew that these firearms played no role in the death of Eddie Charles and that all four defendants had equal access to them. More importantly, the jury was presented with significant circumstantial and direct evidence that Jeffrey Mims shot Charles multiple times or was otherwise involved in the shooting as a principal.
We accordingly hold that, even if the trial court did abuse its discretion in failing to exclude Officer Leary's elaborative testimony, the error was harmless beyond a reasonable doubt. That is, the guilty verdict rendered in this case was surely unattributable to the admission of the testimony about the additional, unused armaments. Everidge, 702 So.2d at 685.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 6:
By this assignment of error, Jeffrey Mims claims that his trial counsel was ineffective in failing to object to what he characterizes as numerous examples of inadmissible "other crimes" evidence.
Generally, the issue of ineffective assistance of counsel is more properly addressed in an application for post-conviction relief filed in the trial court, where a full evidentiary hearing can be conducted. State v. Smith, 97-2221, p. 14 (La.App. 4 Cir. 4/7/99), 734 So.2d 826, 834, writ denied, 99-1128 (La.10/1/99), 747 So.2d 1138. Only if the record discloses sufficient evidence to rule on the merits of the claim does the interest of judicial economy justify consideration of the issues on appeal. Id. Here, however, we believe the record is sufficient to address defendant's claims, which are essentially evidentiary.
The defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that this deficiency prejudiced him. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992). Counsel's performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the "counsel" guaranteed to the defendant by the 6th Amendment of the federal constitution. Strickland, supra, at 686, 104 S.Ct. at 2064. That is, counsel's deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693, 104 S.Ct. at 2068.
La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted *73 in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it plans to use at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other crimes is inadmissible at trial because of the danger that the trier of fact will convict the defendant of the offense for which he is being tried based on his prior criminal or bad acts. State v. Davis, 97-0817, p. 6 (La.App. 4 Cir. 3/24/99), 735 So.2d 708, 711.
Defendant cites seven instances in which the State elicited alleged other crimes or bad acts evidence: (1) the taking of narcotics from "Colombians" by the Mimses and Stewarts; (2) the sale of those narcotics to someone in Baton Rouge; (3) the alerting on U.S. currency found in the Mimses' van by a drug-detecting dog; (4) testimony that narcotics traffickers typically possessed the types of guns found in the van; (5) Jeffrey Mims' possession of identity cards in a name other than his own; (6) Mark Mims' involvement with Walter Ward in narcotics transactions; and (7) the assault in the French Quarter by the Mimses.
The last sentence of La. C.E. art. 404(B)(1) is the codification of the principle of "res gestae." Id. If evidence is admissible under the res gestae exception, it is not subject to any notice requirements. Id. The Louisiana Supreme Court commented on the res gestae exception in State v. Brewington, 601 So.2d 656 (La.1992), stating:
This court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. State v. Boyd, 359 So.2d 931, 942 (La.1978); State v. Clift, 339 So.2d 755, 760 (La. 1976). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, Law of Evidence 448 (2d ed. 1972). The concomitant other crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. 1 Wigmore, Evidence Sec. 218 (3d ed. 1940). State v. Haarala, 398 So.2d 1093, 1097 (La.1981).

Instances 1-2
The State filed a motion for a pre-trial ruling on the admissibility of res gestae evidence that the Mimses ripped off the Colombians in Texas and sold the narcotics in Baton Rouge and also that they were in possession of false identification at the time of their arrests. However, the record does not reflect whether a pre-trial ruling was made as to this evidence.
One theory argued by the State in its effort to convict the Mimses of first degree murder was that the Mimses solicited the Stewarts to commit the murder of Walter Ward and were to pay them for their help with proceeds derived from the sale in Baton Rouge of drugs allegedly taken from the Colombians in Houston days before the homicide of Eddie Charles. While the evidence concerning the drug theft and subsequent sale is not so closely related in time as many cases where the *74 res gestae exception is applied,[12] Jeffrey Mims' counsel could have justifiably believed that evidence of these offenses was so inextricably related to and intertwined with the State's theory as to the charged offense that the trial court most likely would have overruled an objection to such evidence and admitted it pursuant to the res gestae exception. Counsel could have made a strategic decision not to object to the evidence simply to avoid emphasizing it for the jury. This court has previously recognized that, if an alleged error falls "within the ambit of trial strategy," it does not "establish ineffective assistance of counsel." State v. Bordes, 98-0086, p. 8 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147 (quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986)). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." Id. (quoting State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied sub nom Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987)).
Even assuming that counsel's failure to object to the evidence did constitute deficient performance, we believe that the trial court, as indicated above, most likely would have found the evidence admissible under the res gestae exception; and it would have been justified in doing so. Therefore, defense counsel was not constitutionally ineffective for failing to object to evidence of the alleged incident involving "Colombians" or the sale of narcotics in Baton Rouge.

Instances 3-4
Evidence of the drug-detecting dog alerting on the U.S. currency in the Mimses' van was necessary to the presentation of the State's case, in light of the theory that the currency was the proceeds from the sale of narcotics and was intended to pay the Stewarts for their assistance. The probative value of such evidence was not substantially outweighed by its possible prejudicial effect, and it cannot be said the trial counsel's failure to object to such evidence was deficient. And again, the trial court most likely would have allowed the evidence under the res gestae exception.
Testimony by a police officer that drug traffickers usually possess the types of guns found in the van was minimally relevant to the State's case. However, even assuming that the probative value of such evidence was substantially outweighed by its prejudicial effectand thus that defense counsel should have objected to the testimonywe do not find, considering the totality of the evidence against Jeffrey Mims, a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. The jury's finding that Jeffrey Mims was involved in the killing, either as the shooter or as a principal, was surely unattributable to the admission of this testimony.

Instance 5
Turning to the false identification cards, these were seized at the time of Jeffrey Mims' arrest, several hours after the homicide, and so were part of the res gestae. While the probative value of this evidence was slight, so was the chance of undue prejudice: a jury would be unlikely to convict someone of manslaughter simply because he was arrested with false documents.[13] Therefore, even if it *75 were assumed that counsel was deficient in this regard, consideration of the strong circumstantial and direct evidence that Jeffrey Mims fatally shot Charles forecloses a finding of a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.

Instance 6
With regard to the testimony regarding Mark Mims' involvement in drug trafficking with Walter Ward, the prohibition against other crimes evidence only contemplates reference to other crimes by the accused. State v. Buffington, 97-2423, pp. 22 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 352; State v. Martin, 97-1276, p. 7 (La.App. 4 Cir. 11/18/98), 723 So.2d 1021, 1025, writ denied, 98-3148 (La.5/28/99), 743 So.2d 658. Further, Jeffrey Mims' counsel may have made a strategic decision not to object to such testimony, hoping it would cast Mark Mims in a less attractive light.

Instance 7
Finally, with regard to the French Quarter daiquiri shop altercation, there was no evidence that Jeffrey Mims was the aggressor in that event; he could have been a victim, defending himself. There was no evidence that Jeffrey Mims brandished a gun in connection with the altercation. Thus, testimony by various witnesses as to the French Quarter altercation cannot be said to have been a reference to a crime committed by Jeffrey Mims. As to Mark Mims pulling a gun, this would not have been a reference to another crime committed by Jeffrey Mims. And again, defense counsel also may have chosen not to object to such testimony, believing that it might divert attention from Jeffrey to Mark, portraying the latter as someone who readily employs a firearm.
This assignment of error is without merit.

JEFFERY MIMSASSIGNMENT OF ERROR NO. 7:
Jeffrey Mims next claims that the trial court erred in failing to limit the rebuttal argument by the State.
The portion of the rebuttal argument in question, as quoted by defendant in his brief, reflects that an objection was lodged to the remarks by trial counsel for Mark Mims, not Jeffrey Mims. Ordinarily, the failure to contemporaneously object to an alleged error precludes a defendant from raising the error on appeal. La. C.Cr.P. art. 841(A). However, La. C.Cr.P. art. 842 provides that "if an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants." State v. Lavigne, 412 So.2d 993, 995 (La.1982); State v. Dukes, 609 So.2d 1144, 1160 (La. App. 2 Cir.1992), writs denied, 618 So.2d 402 (La.1993), and 93-1421 (La.12/15/95), *76 664 So.2d 435. Accordingly, we will presume that the objection was made by both Mark and Jeffrey Mims.
La. C.Cr.P. art. 774 provides that:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
A prosecutor may not resort to personal experience or turn argument into a oration against crime. State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 716, cert. denied sub nom Williams v. Louisiana, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998). However, prejudicial remarks by a prosecutor do not require reversal unless the reviewing court is firmly convinced that the jury was influenced by the remarks and that the remarks contributed to the verdict. State v. Knighton, 436 So.2d 1141, 1152 (La.1983).
In the remark complained of, the prosecutor referred to defendants as "soldiers of death" and to five kilos of cocaine, as well as rocks and grams therefrom, as "missiles of death" which "are killing our society." In response to the objection, the trial court stated that, if it felt the argument was so prejudicial, it would restrain the prosecutor but that it believed that the jury could "distill emotions from facts"; and it permitted the argument.
The prosecutor's references to cocaine and its effects on our society were clearly inappropriate in this homicide case. The prosecutor was blatantly appealing to the jurors' sense of concern for their community and, thus, to their emotions. However, the evidence presented at trial showed that drug trafficking was included in the events leading up to the murder of Eddie Charles and that the defendants financed their search for Walter Ward in part through the sale of drugs. The State relied in part on the defendants' activities prior to coming to New Orleans to establish that the defendants were capable of and perhaps prone toforming the specific intent to kill Walter Ward and anyone who would not fully assist them in their plan or who would otherwise hinder them in their execution of their plan, whether intentionally or unintentionally. We accordingly find that the prosecutor's comments, while improper, were not without some, albeit slight, justification in relation to the trial as a whole. And again, because of the significant physical evidence connecting Jeffrey Mims with the murder, we do not believe that these remarks contributed to the verdict rendered against him.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 8:
By his next assignment of error, Jeffrey Mims claims the trial court erred in failing to consider the testimony of two jurors from his trial in order to explain an apparent sentencing recommendation on the back of the verdict sheet which stated: "We as a jury feel that Jeffrey Mims be sentenced to the full extent of the law."[14] However, in sentencing Jeffrey Mims, the trial court specifically noted that the "recommendation" had not influenced its sentencing decision. Accordingly, for that reason alone, the trial court properly denied the request to allow the defense to call jurors to the witness stand in order to question them regarding the sentencing recommendation.
Moreover, La. C.E. art. 606(B) provides:
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of *77 the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
Defendant cites La. C.E. art. 606(B), asserting that the provision would permit him to question jurors not about their deliberative process, but about "the intra-juror communications which may have included extraneous influences leading to the sentencing recommendation." Defendant cites no evidence whatsoever that any extraneous prejudicial information was brought to the jury's attention or that any outside influences were brought to bear upon any juror. Thus, defendant has failed to show that he was entitled to question the jurors.
This assignment of error is without merit.

MARK MIMSASSIGNMENT OF ERROR NO. 2; JEFFREY MIMSASSIGNMENT OF ERROR NO. 9:
By these assignments of error, Mark and Jeffrey Mims claim that their sentences are constitutionally excessive.
Article I, Section 20 of the Louisiana Constitution of 1974 provides, "No law shall subject any person ... to cruel, excessive or unusual punishment." A sentence within statutory limits may nonetheless be constitutionally excessive "if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless imposition of pain and suffering." State v. Ash, 97-2061 p. 12 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 670, writ denied, 99-0721 (La.7/2/99), 747 So.2d 15. Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La. C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Egana, supra; State v. Quebedeaux, 424 So.2d 1009 (La.1982). If adequate compliance with art. 894.1 is found, the reviewing court must determine whether the sentence is too severe in light of the particular defendant and circumstances of the case, remembering that only the most egregious violators of the offense charged should receive maximum sentences. State v. Ash, supra; State v. Egana, supra.
In State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, writ denied, 98-2171 (La.1/15/99), 735 So.2d 647, this court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
96-1214 at p. 10, 708 So.2d at 819.
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For *78 legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).
Jeffrey Mims was convicted of manslaughter, a violation of La. R.S. 14:31, providing for a sentence of imprisonment at hard labor for not more than forty years. He received the maximum sentence. In sentencing defendant, the trial court took note of the presentence investigation report, which reflected no prior convictions but did reflect prior local arrests for possession of stolen property in 1976; illegally carrying weapons in 1983; theft in June 1985; and unauthorized use of a moveable in October 1985. The report noted that Jeffrey Mims had sustained successful employment since graduating from high school and had achieved financial success in his body shop business. The report also noted that the victim's family felt that Jeffrey Mims should receive the maximum penalty. The report recommended imprisonment, but it did not recommend a particular term. Jeffrey Mims was two months short of his fortieth birthday when sentenced. In sentencing Jeffrey Mims, the court noted that defendant had been concerned about the safety of his brother and his family. The court, however, said it believed that defendant had acted irrationally. The court rejected the sentencing guidelines then in effect, stating that the crime was so severe that the guidelines should not be applicable, as this was "one of the most severe manslaughter cases" it had ever seen.
Jeffrey Mims cites this court's decision in State v. Soraparu, 93-1636 (La.App. 4 Cir. 1/19/95), 649 So.2d 1100, where this court vacated a forty-year maximum sentence imposed on a first-felony defendant convicted of manslaughter as both constitutionally excessive and excessive under the sentencing guidelines. The victim had been shot once in the head, and in imposing sentence the trial court stated that it was not following the sentencing guidelines because the crime was a "very cold and deliberate act" and "in all essence" a crime of second degree murder. 93-1636 at p. 8, 649 So.2d at 1104. But defendant fails to acknowledge that the Louisiana Supreme Court reversed that decision as to the sentence in a per curiam opinion, State v. Soraparu, supra, stating that the trial court's reasons adequately supported the sentence, even though it was outside of the recommended sentence under the sentencing guidelines.[15]
In the instant case, the victim was shot at least six times, with at least three bullets being fired from the gun that Jeffrey Mims pointed at police officers within several hours of the murder. Eight spent cartridge casings found under and around the victim's body had been fired from that gun, i.e. the Beretta with the black rubber grips. The trial court believed that the circumstances of the crime warranted the maximum sentence, and as in Soraparu, its reasons adequately support the sentence imposed on Jeffrey Mims.
Mark Mims was also convicted of manslaughter and received a forty-year sentence. However, he was sentenced as *79 a second-felony habitual offender pursuant to La. R.S. 15:529.1(A)(1)(a). Under that provision, he could have received a sentence of twenty to eighty years at hard labor. He received a sentence of twice the minimum but one-half of the maximum. In sentencing Mark Mims, the trial court noted that it had compassion for him, stating: "If anybody was provoked to do anything, it would be you, but you couldn't take the actions that you took." Accordingly, the court stated that it was not going to increase the original forty-year sentence it had imposed on defendant.
The presentence investigation report noted that Mark Mims, who was thirty-six years old at the time of sentencing, had one prior felony conviction by a guilty plea in June 1989 for possession of stolen property valued at $500.00 or more. At trial he denied knowing that the property, an automobile, had been stolen. The report noted that the victim's mother wished that defendant would receive the maximum sentence allowable by law. Defendant had three children, including two with his former wife. While the evidence tends to show that Jeffrey Mims actually fired the shots that killed Eddie Charles, it also indicates that Mark Mims kidnapped Leo Wyre at gunpoint and may have attempted to shoot Charles. Defendant drew and brandished a handgun in the French Quarter within hours of the homicide and allegedly attempted to bring an AK-47 to bear on a police officer shortly thereafter. The homicide was precipitated by Mark Mims' actions in associating with and attempting to confront Walter Ward and the victim; defendant was a prime mover in the events leading up to the murder. Considering the totality of the facts and circumstances, it cannot be said that defendant's sentence is nothing more than the needless imposition of pain and suffering or is grossly disproportionate to the severity of the crime.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 10:
By this assignment of error, Jeffrey Mims asserts that the record is incomplete, claiming that neither the voir dire, the trial court's pretrial ruling on the motion to suppress the items seized from the van, nor the trial court's supplemental jury instruction on the law of principals is contained therein.
La. Const. Art. I, § 19 provides that "[n]o person shall be subjected to imprisonment... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La. C.Cr.P. art. 843 requires, in all felony cases, the recording of "all the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements and arguments of counsel." As a corollary, La. R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required.
A criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel. State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214, at 215. "[W]here a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully recorded trial." Id. (quoting State v. Ford, 338 So.2d 107, 110 (La. 1976)). However, this court has held that a complete appellate review of a conviction and sentence can be accomplished, even when there are missing portions of the trial record. See, e.g., State v. Cooley, 98-0576, p. 9 (La.App. 4 Cir. 11/17/99), 747 So.2d 1182, 1187.
*80 While defendant's private appellate counsel asserts that the voir dire was not transcribed, counsel does not argue that it cannot be transcribed. The record reflects that defendant's private appellate counsel did not request a transcript of the voir dire. As the Louisiana Supreme Court stated in Ford, supra, it is only where a "defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors" a new trial is required. 338 So.2d at 110 (emphasis added). Further, the minute entry of the voir dire proceedings does not reflect that any objections were made. Accordingly, defendant is not entitled to a new trial based on the absence of the voir dire transcript from the record.
As to the alleged absence from the record of the trial court's ruling on defendant's motion to suppress "the van," the record does contain transcripts of hearings held on the motion to suppress the evidence. The record also contains a full trial transcript, showing that police officers had reasonable suspicion to stop the van. Further, it is not disputed that the trial court denied defendant's motion to suppress as to all evidence seized in this case. The absence of a "ruling" in the record denying defendant's motion to suppress "the van" does not deny defendant any due process rights, and he is not thereby prejudiced in any way.
Lastly, defense counsel alleges that the record does not contain a complete transcript of the trial court's re-instruction of the jury as to the law of principals. The transcript of the jury instructions does include the court's re-instructions, given in response to specific requests by the jury, and the returning of the verdict. There is nothing in the jury re-instructions to indicate that any portion of the transcript of those re-instructions is missing.
This assignment of error is without merit.

JEFFREY MIMSASSIGNMENT OF ERROR NO. 11:
Jeffrey Mims' appellate counsel makes no argument as to this assignment of error, listed in his list of assignments of error as one that the trial court erred in re-instructing the jury on the law of principals. "Any specification or assignment of error not briefed is considered abandoned." State v. Anderson, supra, 97-2587 at 9-10, 728 So.2d at 20; Rule 2-12.4 Uniform Rules Courts of Appeal. Moreover, the jury re-instructions reflect no objections by defense counsel.[16]
Accordingly, this assignment of error is considered abandoned.

JEFFREY MIMSPRO SE ASSIGNMENT OF ERROR NO. 1:[17]
By this pro se assignment of error, Jeffrey Mims claims that the trial court erred in instructing the jury as to the law of principals. However, the record shows no objections to the trial court's jury instructions or re-instructions. Under La. C.Cr.P. art. 801, "A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error." Therefore, defendant cannot raise this issue on appeal.

KEITH STEWART'S ASSIGNMENT OF ERROR:
By his sole assignment of error, Keith Stewart's counsel requests a review of the record for errors patent. Keith Stewart pleaded guilty to an amended indictment charging him with manslaughter, reserving no rights, and was sentenced to ten years at hard labor.
*81 Counsel complied with the procedures outlined by Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), as interpreted by the Louisiana Supreme Court in State v. Mouton, 95-0981, p. 2 (La.4/28/95), 653 So.2d 1176, 1177. Counsel's detailed review of the procedural history of the case and the facts of the case evidences a thorough review of the record. Counsel has moved to withdraw because he believes, after a conscientious review of the record, that there are no non-frivolous issues to be raised on appeal. Counsel has reviewed the waiver of rights form completed by defendant in his guilty plea, as well as the transcript of a plea discussion between the trial court and Keith and Leroy Stewart, and has found no issues arguably supporting the appeal. Counsel noted that defendant filed a post-sentence application for reduction of sentence, arguing that the sentence was an upward departure from the then effective sentencing guidelines. However, counsel notes that the sentencing guidelines are not mandatory and states that the ten-year sentence cannot be considered constitutionally excessive. A copy of the brief was forwarded to Keith Stewart, and this court informed defendant that he had the right to file a brief on his own behalf. Keith Stewart has filed no brief.[18]
In addition, as per State v. Benjamin, supra, this court has conducted an independent, thorough review of all the pleadings filed in the district court, all minute entries of the district court proceedings, the bill of information and all transcripts contained in the appeal record. Defendant was properly charged by grand jury indictment with first degree murder, a violation of La. R.S. 14:30, which was later amended to a charge of manslaughter, a violation of La. R.S. 14:31. Defendant was present and represented by counsel at arraignment, all hearings, and sentencing. Keith Stewart pled guilty after being orally advised of and waiving his rights. He executed a plea of guilty form reflecting that he waived his right to trial and appeal; his right to confront and cross-examine his accusers; his privilege against self-incrimination; and his right to compel witnesses to appear and testify. The guilty plea form contains a notation that no agreement had been made regarding a sentence and that the court had not indicated what sentence it might impose, informing defendant instead that the sentence would depend on the presentence investigation report and other sentencing information. An independent review of the record reveals no non-frivolous issues, and a review of all transcripts contained in the appeal record reveals no trial court ruling undermining defendant's plea. The sentence is not illegal or unconstitutionally excessive.

CONCLUSION:
For the foregoing reasons, we affirm the convictions of Mark Mims, Jeffrey Mims and Keith Stewart. We also affirm the sentences imposed on Jeffrey Mims and Keith Stewart; but, due to an error patent, we vacate Mark Mims' sentence as a habitual offender and remand his case for resentencing. Finally, we grant the motion to withdraw filed by Keith Stewart's appellate counsel.
CONVICTIONS AFFIRMED; TWO SENTENCES AFFIRMED; ONE VACATED AND REMANDED FOR RESENTENCING.
ARMSTRONG, J., CONCURS.
NOTES
[1] The record does not contain a minute entry or docket master entry indicating either the fact or the date of the denial of a motion to suppress the evidence, nor was a ruling made at the end of one of the hearings, the transcripts of which are contained in the record. However, defendants filed a motion to reopen the hearing on the motion to suppress, and a hearing was held during which the trial court stated that the factors urged by defendants Mark and Jeffrey Mims would not have affected his original ruling denying the motion.
[2] State v. Mims, unpub., 95-1587 (La.App. 4 Cir. 9/27/95).
[3] State v. Mims, unpub., 96-0553 (La.App. 4 Cir. 3/20/96).
[4] Pursuant to the firearms sentencing provision of La. C.Cr.P. art. 893.3 in effect at the time of the offense.
[5] See n. 4.
[6] See State v. Mims, unpub., 96-2757 (La.App. 4 Cir. 1/23/97) (writ granted in part-trial court ordered to lodge appeal for Jeffrey Mims, appoint counsel, and file notice of appeal).
[7] See State v. Stewart, unpub., 97-0294 (La. App. 4 Cir. 3/20/97) (writ granted for the purpose of transferring it to the trial court for consideration as a motion for appeal).
[8] See State v. Mims, unpub., 97-0720 (La.App. 4 Cir. 4/23/97) (writ granted-trial court ordered to lodge appeal for Mark Mims, appoint counsel, and file notice of appeal).
[9] For some reason, when reading the serial number during his testimony, Officer Mitchell left the letter "Z" off the end of serial number.
[10] This court denied the Mimses' writ application regarding this ruling in State v. Mims, unpub., 95-1587 (La.App. 4 Cir. 9/27/95).
[11] Counsel for Jeffrey Mims stipulated to a proper chain of custody for all evidence seized from him.
[12] But see State v. Bilbo, 97 2189 (La.App. 1 Cir. 9/25/98), 719 So.2d 1134, writ denied, 98-2722 (La.2/5/99), 737 So.2d 747 (evidence of kidnapping and robbery in Florida six days prior to kidnapping in Louisiana admissible as res gestae).
[13] In the recent case of State v. Colomb, 98-2813, pp. 4-5 (La.10/1/99), 747 So.2d 1074, 1076-77, the Louisiana Supreme Court noted the differing views on whether res gestae evidence is subject to the balancing test of La. C.E. 403, stating:

Given the probative value of these context facts, we need not decide here whether integral act evidence presented under the authority of La. C.E. art. 404(B) must invariably pass the balancing test of La. C.E. art. 403. Cf. former R.S. 15:447 ("What forms any part of the res gestae is always admissible in evidence."); State v. Brown, 428 So.2d 438, 442 (La.1983) ("[E]vidence of other crimes included in the res gestae is admissible without balancing its probative value against the prejudicial effect.") (citations omitted); State v. Smith, 94-1502, p. 6 (La.App. 4th Cir.1/19/95), 649 So.2d 1078, 1083 ("It is no longer true that whatever forms part of the res gestae is admissible, and such evidence remains subject to the [art. 403] balancing test."); 1 McCormick on Evidence, supra, § 190, p. BOD, n. 12 ("It seems preferable to say that this evidence of `intertwined' crimes may be admitted, since it does not run afoul of the propensity rule, assuming that the balance of probative value and prejudice favors admission and that the normal safeguards ... for dealing with other crimes evidence are observed."). Unfair prejudice to a criminal defendant "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief [v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)]
[14] The same recommendation was written on the back of Mark Mims' verdict sheet.
[15] See also State v. McKinney, 94-2113 (La. App. 4 Cir. 4/24/96), 673 So.2d 1205, writs denied, 96-1595 (La.8/27/97), 707 So.2d 42 (noting that Act 942 of 1995 legislatively overruled this court's decision in Soraparu).
[16] See the next assignment of error (Jeffrey Mims-Pro Se Assignment of Error No. 1).
[17] Jeffrey Mims' second pro se assignment of error was addressed in addressing Jeffrey Mims-Assignment of Error No. 3. His third pro se assignment of error was addressed in addressing Mark Mims-Assignment of Error No. 1.
[18] Counsel notes in his brief that Keith Stewart was released from prison on "good time" in June 1998.